**Opinion issued July 19, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00764-CV

————————————

## CHCA BAYSHORE, L.P. D/B/A EAST HOUSTON REGIONAL MEDICAL CENTER AND PASADENA BAYSHORE HOSPITAL, INC., Appellants

## V.

## AMY RAMOS AND RICHARD RAMOS, Appellees

---

### On Appeal from the 234th District Court
### Harris County, Texas
### Trial Court Case No. 2010-49225

---

# O P I N I O N

Appellants CHCA Bayshore, L.P. d/b/a East Houston Regional Medical Center and Pasadena Bayshore Hospital, Inc. (collectively, the "Hospital") bring this statutory interlocutory appeal from the denial of their motion to dismiss under

section 74.351 of the Texas Civil Practice and Remedies Code. In one issue, the Hospital contends that the trial court erred because appellees Amy and Richard Ramos asserted a health care liability claim and did not timely serve an expert report.

We reverse the order of the trial court and remand for further proceedings consistent with this opinion.

## Background

Amy Ramos had a dilation and curettage procedure after suffering a miscarriage when she was approximately 12 weeks pregnant. The operative report of Amy's obstetrician indicated that a "specimen was sent to pathology" for testing. Because Amy and her husband wished to hold a funeral, the obstetrician instructed the pathology department to test the specimen and then hold it for the funeral home.

The next day, a funeral home employee went to the Hospital to receive the specimen for burial. After the Ramoses held the funeral, they learned that the Hospital had given the wrong specimen to the funeral home. The buried specimen was exhumed and found to be the amputated toe of another patient. The Ramoses later buried the correct specimen.

The Ramoses sued the Hospital, alleging negligence and negligent infliction of emotional distress. Specifically, they alleged that the Hospital acted negligently

2

with respect to the identification, handling, and disposition of the specimen, in regard to training their employees, and in relation to their policies and procedures. The Hospital filed a motion to dismiss, arguing that the Ramoses had pleaded a health care liability claim governed by Chapter 74 of the Texas Civil Practice and Remedies Code, yet they failed to timely serve an expert report. The Ramoses denied that their claim was a health care liability claim and argued that no expert report was required. In their response to the Hospital's motion to dismiss, the Ramoses argued in part that "there is no specialized standard in the health care community that applies for the pathology department['s] failure to deliver the correct remains to the funeral home; and there is no medical judgment related to the care or treatment of the fetal remains." After a hearing, the trial court denied the motion to dismiss, and the Hospital filed this interlocutory appeal.

**Analysis**

The sole issue in this appeal is whether the Ramoses' claim qualifies as a health care liability claim governed by the Medical Liability Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001–.507 (West 2011). A claimant who files a health care liability claim must serve an expert report on each party or his counsel not later than the 120th day after the claimant's original petition was filed. *Id.* § 74.351(a). If the claimant fails to do so, the trial court must dismiss the health care liability claim on the defendant's motion. *Id.* § 74.351(b).

3

In this case, the Hospital moved to dismiss the Ramoses' suit because they were required but failed to file an expert report in support of their alleged health care liability claim. We review a trial court's denial of a motion to dismiss under Chapter 74 of the Texas Civil Practice and Remedies Code for abuse of discretion. *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). However, when the issue on appeal raises a question of law, such as whether the statute applies to a particular claim, we employ a de novo standard of review. *Tex. W. Oaks Hosp., L.P. v. Williams*, No. 10-0603, 2012 WL 2476807, at *3 (Tex. June 29, 2012).

"Whether a claim is a health care liability claim depends on the underlying nature of the claim being made." *Yamada v. Friend*, 335 S.W.3d 192, 196 (Tex. 2010). Chapter 74 defines a health care liability claim as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13). The Hospital relies on *Diversicare General Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005), and subsequent related cases, to argue that the Ramoses' claims—which concern the handling of a tissue specimen and related training issues—satisfy this definition because they allege a departure from accepted standards of "health care." The

4

Hospital also argues that the Ramoses' claims allege a departure from accepted standards of care for "professional or administrative services directly related to health care."

We conclude that the Ramoses' claims are health care liability claims. Regardless of whether *Diversicare* and its progeny support characterizing the Ramoses' claims as ones for a "departure from accepted standards of medical care, or health care," we conclude that a separate aspect of the statutory definition of "health care liability claim"—that term's inclusion of "professional or administrative services directly related to health care"—more naturally captures the essence of the Ramoses' claims.

## I.    Professional or administrative services

"Professional or administrative services," as that phrase is used in the Medical Liability Act, are "those duties or services that a physician or health care provider is required to provide as a condition of maintaining the physician's or health care provider's license, accreditation status, or certification to participate in state or federal health care programs." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(24). The Ramoses alleged that the Hospital was negligent in its failures to properly identify the remains of the fetus, to establish and follow policies and procedures for identifying and surrendering remains, to properly secure and monitor the fetal remains, to train and manage its employees to prevent

5

mislabeling or misidentifying the fetal remains, to establish and implement a comprehensive program to prevent confusion of remains, and to establish and implement a comprehensive program to prevent the improper surrender of remains. The crux of these allegations is that the Hospital failed to properly handle, identify, monitor, and dispose of a specimen resulting from a medical procedure.

### a. Mishandling of specimen

Texas hospitals are required to obtain a license prior to admitting patients. *See* TEX. HEALTH & SAFETY CODE ANN. § 241.021 (West 2012); 25 TEX. ADMIN. CODE ANN. § 133.21(a)(1) (2012) (Tex. Dep't of State Health Servs., Hospital License). During the licensing period, a hospital is required to comply with applicable legislative and regulatory requirements. *See* 25 TEX. ADMIN. CODE ANN. § 133.21(b); *see generally* TEX. HEALTH & SAFETY CODE §§ 241.001–.156 (West 2012) (Texas Hospital Licensing Law); 25 TEX. ADMIN. CODE ANN. §§ 133.1–133.169 (2012) (Hospital Licensing). Among other things, the Texas Administrative Code requires that a hospital "shall maintain directly, or have available adequate laboratory services to meet the needs of its patients." 25 TEX. ADMIN. CODE ANN. § 133.41(h) (Hospital Functions & Servs.). It also requires that a hospital laboratory "shall make provision for proper receipt and reporting of tissue specimens." *Id.* § 133.41(h)(3)(C). And although an exemption is provided for the disposition of fetal remains by transfer to a licensed funeral director, *see id.*

§ 1.133(a)(2)(F), there are specific regulations applicable to the treatment and disposition of "special waste from health-care related facilities," including fetuses and tissues. *See id.* §§ 1.131–1.137, 1.132(40) (Tex. Dep't of State Health Servs., Definition, Treatment, & Disposition of Special Waste from Health-Care Related Facilities).

Hospitals are required to abide by these regulations, and a hospital's license may be denied, suspended, or revoked for failure to comply. *See* TEX. HEALTH & SAFETY CODE § 241.053(a)(1); 25 TEX. ADMIN. CODE ANN. § 133.121(1)(B) (Tex. Dep't of State Health Servs., Enforcement Action). To comply with the general requirements pertaining to hospital laboratories and the specific requirements pertaining to special waste, a hospital must have a means of identifying and storing specimens, before and after testing. Procedures to ensure proper identification and handling of the specimens are necessary to compliance with the regulations pertaining to disposition of these types of specimens. Thus the identification, handling, and ultimate disposal of specimens are services that a health care provider is required to provide as a condition of maintaining its license. Accordingly, we conclude that these functions—identification, handling, and disposal of specimens—are professional or administrative services as contemplated by Chapter 74. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(24).

### b. *Negligent training and supervision*

The Ramoses also alleged negligence pertaining to the Hospital's training and supervision of its employees and its establishment and maintenance of policies and procedures for labeling, handling, and disposition of specimens. The determination of whether such causes of action are health care liability claims requires an examination of the claims' underlying nature. *Harris Methodist Fort Worth v. Ollie*, 342 S.W.3d 525, 527 (Tex. 2011) (per curiam).

The training and supervision of employees, as well as the maintenance of adequate policies, are an inseparable part of fulfilling a hospital's responsibilities for the proper handling of specimens. For the reasons explained above, allegations of these kinds of negligence directly implicate activities that are professional or administrative services under the statute. Accordingly, they too may constitute health care liability claims, so long as the other requirements of the statute are satisfied. *Cf. Diversicare*, 185 S.W.3d at 848, 849–50 (a claim of negligent supervision or failure to train is classified as a health care liability claim when the claim alleges "a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services"); *Ollie*, 342 S.W.3d at 527 (similar causes of action alleged for claimed departures from accepted standards of "safety" may also be health care liability claims).

## II. Direct relation to health care

In order to give rise to a health care liability claim, the "professional or administrative services" implicated by a cause of action against a health care provider or physician must be "directly related to health care." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13); *see Tex. W. Oaks*, 2012 WL 2476807, at *10. Chapter 74 defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10).

In this case, the Hospital's challenged actions were directly related to the health care that Amy received while in the Hospital. First, Amy was unquestionably a recipient of "health care" for purposes of the statute. While she was a patient of the Hospital, Amy underwent "treatment"—a dilation and curettage procedure—which was rendered on her behalf by a health care provider. During the course of Amy's treatment, the Hospital obtained a specimen of fetal remains. Both the dilation and curettage procedure and the removal of the fetal remains qualify as an act or treatment that satisfy the definition of "health care" in section 74.001(a)(10).

Moreover, the alleged mishandling of the specimen that occurred after the dilation and curettage procedure and the removal of the fetal remains was "directly

related" to the "health care" received by Amy. The fetal remains were initially obtained during and as a result of her dilation and curettage procedure. The Hospital thus came into possession of the specimen as a direct result of providing health care to Amy. Once the specimen was removed from Amy and it came into the control of the Hospital, the Hospital was obligated to maintain the specimen and ultimately dispose of it in compliance with applicable regulations and the patient's instructions. The Hospital is alleged to have negligently handled the remains. If it did so, that action was an immediate consequence of having performed the procedure that resulted in the Hospital's handling of the remains, and as such, it was directly related to the health care rendered to Amy by the Hospital.

Based upon the statutory definition of "health care" and its reference to treatment performed "during the patient's medical care, treatment, or confinement," *id.* § 74.001(a)(10), the Ramoses contend that the Hospital's challenged actions must have been committed "during the patient's medical care, treatment, or confinement" to qualify as a health care liability claim. *Id.* § 74.001(a)(10), (19) (definitions of "health care" and "medical care"). Because the allegedly tortious act—providing the wrong specimen to the funeral home— occurred after Amy was discharged from the Hospital, the Ramoses thus argue that their claims do not meet the statutory definition of a health care liability claim.

We disagree with the Ramoses' interpretation of the statute as it relates to actions arising from professional or administrative services. In the context of such a claim, it is not necessary that the professional or administrative services occur during the patient's medical care, treatment, or confinement. Instead, those services only need be "directly related" to "health care," including treatment that was or should have been performed during the patient's medical care, treatment, or confinement. *See id.* § 74.001(a)(13) (definition of "health care liability claim"); *accord TTHR, L.P. v. Coffman*, 338 S.W.3d 103 (Tex. App.—Fort Worth 2011, no pet.). We hold that the Hospital's professional or administrative services relating to its handling of the fetal remains resulting from Amy's dilation and curettage procedure were directly related to the health care provided to Amy by the Hospital.

## III. Absence of need for medical expert testimony

Finally, the Ramoses contend that they did not allege a health care liability claim because there allegedly is no need for specialized medical expert testimony to prove a claim of negligence with respect to the mishandling of a specimen as alleged in their petition. Their argument that they have alleged negligence that is within the common knowledge of laymen is unavailing.

In *Yamada v. Friend*, 335 S.W.3d 192 (Tex. 2010), the Supreme Court of Texas unanimously held that one set of underlying facts cannot separately support health care liability claims and ordinary negligence claims. In *Yamada*, the

11

plaintiffs sued Dr. Yamada and others after their daughter collapsed at a water park and later died from a heart condition. 335 S.W.3d at 193. The plaintiffs alleged that Dr. Yamada, a medical doctor who specialized in emergency medicine, had failed "to properly provide advice and recommendations to the City about its safety practices," including the placement and maintenance of automated external defibrillators at the water park. *Id.* The plaintiffs' pleadings stated claims for both ordinary negligence and negligence based on a breach of an emergency medicine physician's standard of care. *Id.* They did not file a timely expert report. *Id.* The court of appeals dismissed the part of the case relating to the physician's standard of care but refused to dismiss the ordinary negligence claims. *Id*. The Supreme Court reversed, holding that in light of its prior decisions "to the effect that if the gravamen or essence of a cause of action is a health care liability claim, then allowing the claim to be split or spliced into a multitude of other causes of action with differing standards of care, damages, and procedures would contravene the Legislature's explicit requirements." *Id.* at 197. The Court further noted, "[I]t would be hard to find a health care liability claim in which some action by the health care provider or physician arguably would not be within the common knowledge of jurors, and thus would support a claim for ordinary negligence." *Id.*

The suggestion that expert testimony is not required to prove the claim is not dispositive of whether it qualifies as a "health care liability claim." Even when

expert medical testimony is not necessary, the claim may still be a health care liability claim. *See Tex. W. Oaks*, 2012 WL 2476807, at *8. The statute does not expressly state that a claim must require supporting expert testimony to qualify as a health care liability claim, nor can that requirement by implied from the standard set forth in the statute.

## Conclusion

We conclude that the Ramoses' petition alleges a health care liability claim. TEX. CIV. PRAC. & REM. CODE. ANN. § 74.001(a)(13). Because they did not timely serve an expert report, we hold that the trial court erred by denying the Hospital's motion to dismiss. We sustain the Hospital's sole issue.

We reverse the order of the trial court and remand the case to the trial court with instructions to dismiss the Ramoses' claims and for further proceedings consistent with this opinion. *See id.* § 74.351(b).

Michael Massengale
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Justice Jennings, dissenting. Publish pursuant to TEX. R. APP. P. 47.4.

13